# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| LOOP PAPER RECYCLING, INC., an Illinois corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No. 08 C 7364 |
| JC HORIZON LTD., a California corporation, | ) ) ) | Magistrate Judge Jeffrey Cole |
| Defendant. | ) ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This is a case about paper – tons of it – and the parties' attempt to settle the litigation involving their ill-fated contracts that obligated Loop Paper Recycling, Inc. ("Loop Paper") to sell and JC Horizon Ltd. ("JC Horizon") to buy prescribed minimum quantities of various kinds of paper at specified prices. The contracts also set certain "estimated maximum" amounts, which limited the monthly tonnage that JC Horizon could purchase. Loop Paper had the discretion to fill those orders or not. Early in the relationship, intractable disputes arose, and Loop Paper sued JC Horizon, claiming it did not purchase the required minimum amounts of paper specified in the contracts. JC Horizon promptly filed a counterclaim charging that Loop Paper did not supply what it was contractually obligated to supply and alleging shortages in what was provided. As we shall see, the nature of the conflict is significant in resolving the question of what the parties' settlement agreement was intended to achieve.

This case appeared not to be an exception to the rule that, at least in the federal system, most cases are settled rather than tried, *United States v. Dawson*, 425 F.3d 389 (7th Cir. 2005), and the

parties amicably settled the case. Or so they thought. Now, the problem is that although they agree on the terms of their settlement agreement, they disagree over the meaning of those terms. And, as you might have guessed, the sticking point is the amount of paper the agreement requires Loop Paper to supply and JC Horizon to purchase. This disagreement has proved as vexing as the dispute that generated the litigation, itself.

JC Horizon has filed what is captioned a motion to enforce the settlement agreement-- according, of course, to *its* interpretation of the acknowledged terms.[1] What is odd about JC Horizon's construction of the terms of the settlement agreement is that it puts the required paper tonnages that Loop Paper was obligated to sell and it was obligated to buy back to what they were originally – that is, back to the exact amounts that were the source of the parties' problems and which precipitated litigation in the first place. While agreeing that there was a settlement agreement, Loop Paper has opposed the motion and advanced its own interpretation of the agreement, which effectively cuts in half the amounts the parties are now *obligated* to buy and sell when compared to those in the original contracts.

But Loop Paper has not moved to enforce its interpretation of the agreement. This was not an oversight, as Loop Paper's response brief stresses:

> Indeed, Loop Paper could have taken the position that JC Horizon has failed to honor the terms reached during the August 7, 2009 meeting. Loop Paper, however, chose to forego the Court's intervention and declare the "negotiations" failed. Loop Paper seeks only to restore the parties to the same positions they were in prior to the negotiations and proceed with the pending breach of contract claims.

*Plaintiff's Brief in Opposition to Motion to Enforce Settlement Agreement*, at 9.

---

[1] A motion that seeks specific performance of a settlement agreement is effectively a request for a "mandatory injunction to perform." *American Hosp. Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 594 (7th Cir.1986). *See also Resolution Trust Corp. v. Ruggiero*, 994 F.2d 1221, 1225 (7th Cir.1993).

This statement comes at the end of a terse, alternative argument that there was never any enforceable settlement agreement, as there was no "meeting of the minds," and thus there is nothing to enforce. *See* discussion *infra* at 25. Effectively, the motion is, as it states, in the nature of a request for a "declar[ation]" that there was never a settlement agreement, and thus the parties should resume the litigation. But this suggestion is secondary to its argument that its construction of the settlement agreement is the right one. The parties have consented to jurisdiction here for the limited purpose of deciding this motion. *See* 28 U.S.C. §§ 636(c)(1); Rule 73(a), Federal Rules of Civil Procedure. Consequently, any appeal from the instant ruling is not to Judge Darrah, but to the Court of Appeals. *Roell v. Withrow*, 538 U.S. 580 (2003); 28 U.S.C. §636(c)(3); Rule 73(c), Federal Rules of Civil Procedure. Since I do not, however, have jurisdiction under the limited consents to dispose of the case formally, the case will have to go back to Judge Darrah.

## I.
## FACTUAL BACKGROUND

Loop Paper, of Chicago, sells paper products in bulk. JC Horizon, based in California, buys paper products and resells them. In April 2008, the companies executed two sales agreements by which Loop Paper agreed to sell to JC Horizon various quantities of four kinds of paper. The term of the agreement was for three years. One agreement covered two types of newspaper, #8 and #9 ("the newspaper agreement"), while the other covered mixed paper, and old corrugated cardboard. ("the mixed paper/OCC agreement"). Under the agreements, JC Horizon was required to purchase, and Loop Paper was required to supply, certain minimum quantities on a monthly basis:

> A minimum of 500 tons a month of Newspaper #8 and 500 tons a month of Newspaper #9 at OBM Chicago High Side price plus $55/ton for Newspaper #9, and plus $50/ton for Newspaper #8.

A minimum of 1,000 tons a month of Mixed Paper #3 at the OBM Chicago High Side plus $45/ton.

A minimum of 3,000 tons a month of OCC #11 at OBM Chicago High Side plus $45/ton.

(*Memorandum of Law in Support of JC Horizon's Motion*, Ex A, at 1 & A-A, Ex. B, at 1 & B-A).

Both agreements also contained "estimated maximum" quantities that capped the amount JC Horizon could purchase each month. For newspaper (#8 and #9), the estimated maximum was 1,500 tons per month, and for mixed paper (#3) and OCC (#11), it was 1,500 and 3,500 tons per month, respectively. (*Id.*). Each agreement provided that the "estimated maximum" allowed for fluctuations in Loop Paper's ability to produce an exact maximum volume during a given month. While Loop Paper had to sell quantities within the defined minimum tonnages, and JC Horizon had to pay for that amount of paper whether it ordered it or not, neither party was contractually obligated to sell or buy or pay for amounts that exceeded those minimums.[2]

The relationship was short-lived, to say the least. After about only seven months, in December 2008, Loop Paper sued JC Horizon, claiming that JC Horizon consistently failed to

---

[2]The Exclusive Supply and Purchase Agreement dated 4/19/08 and attached as Exhibit A to defendant's motion to enforce settlement agreement, provides in ¶3, captioned, QUANTITY,, that buyer will purchase a "minimum of 500 tons per month of product" and an estimated maximum 1500 tons per month of #8 newspaper. Paragraph 3 explains that the estimated maximum "allows for fluctuation in the Seller's ability to produce an exact maximum volume during a given month." Paragraph 6, entitled, "MINIMUM TONNAGE PURCHASE REQUIREMENTS," provides that the buyer guarantees it shall purchase not less than 1500 tons of material per month and that in the event it fails to purchase and accept delivery of "said minimum tonnage requirements," it shall be responsible for payment "for the minimum tonnage requirement on a monthly basis regardless of whether Buyer submitted a purchase order for said minimum tonnage."

The contract covering # 3 had a minimum purchase requirement of 1000 tons per month, and an estimated maximum of 1500 tons per month. # 11 had a minimum purchase requirement of 4000 tons per month and an estimated maximum of 5000 tons per month. However, JC Horizon guaranteed that it would only pay for the minimum tonnage, even if it ordered less. *See* Exclusive Supply and Purchase Agreement dated 4/19/08 and attached as Exhibit B to defendant's motion to enforce settlement agreement, ¶¶ 3,6.

purchase the monthly minimum tonnages, except for a few months, and then for only one of the products. JC Horizon counterclaimed, asserting that Loop Paper committed material breaches that caused JC Horizon significant damage, thereby legally excusing JC Horizon's obligation to further perform under the agreements. JC Horizon also alleged that Loop Paper routinely failed to fill JC Horizon's purchase orders, instead offering up only fractions of the quantities of paper requested. There were also charges that Loop Paper represented to JC Horizon that certain freight containers were filled to a certain weight, but when JC Horizon's customers received those containers, their weights were significantly less than had been represented. JC Horizon also alleged that on at least one occasion, Loop Paper canceled their entire order, without explanation.

As the litigation progressed, a settlement conference was scheduled for August 7, 2009, with attorneys and representatives from the two companies with "full settlement authority." As the conference approached, JC Horizon's president, Judy Lee, and George Ward, a Loop Paper officer, began negotiating a potential settlement. While their counsel knew of the discussions, they did not directly participate. At midday on August 6, it appeared the parties had reached an agreement, but not quite. JC Horizon's attorney emailed Loop Paper's attorney to confirm there was an agreement, but the exchange that followed indicated that the parties were close, but not there yet. In the end, the two attorneys agreed that a two-week continuance of the settlement conference might be in order. (Hirsch Aff., Ex. A). The two principals continued their negotiations, haggling over price and, as it happened, Ms. Lee made the trip to Chicago for the settlement conference.

Mr. Ward asked Ms. Lee to meet with him the morning of August 7th, before the scheduled 3:30 p.m. conference. They were joined by Jeff Godfrey, a Loop Paper financial representative, who apparently did not participate in their discussions. (*Loop Paper's Brief in Opposition*, Ex. B). The

parties agree that a settlement was reached during those negotiations.   Mr. Ward took notes during the negotiations, and his jottings as to the final agreement are set out below, with the original being handwritten of course:

| | | | | | |
|---|---|---|---|---|---|
| #8 | 250 | ~~40~~ | ~~39~~~~50~~ ~~39~~ | 38 | |
| | 250 | FAS | #8 | | |
| #3 | 500 | ~~39~~~~50~~ | #3 | ~~38~~ | |
| | | | | 37~~50~~ | |
| | 500 | FAS | | | |
| #11 | 1500 | ~~40~~ | ~~37~~~~50~~~~39~~ | 39 | |
| | 1500 | FAS | #11 | | |

(*Loop Paper's Brief in Opposition*, Ex. A-1).  The parties agree that this denoted the following price terms:

| | |
|---|---|
| Newspaper # 8 : | 250 tons/month at OBM high side plus $38 |
| | Additional 250 tons/month at the OBM Expo price |
| Mixed paper #3: | 500 tons/month at OBM high side plus $37.50 |
| | Additional 500 tons/month at OBM FAS price |
| OCC #11: | 1,500 tons/month at OBM high side plus $39 |
| | Additional1,500 tons at OBM export price. |

(*Memorandum of Law in Support of JC Horizon's Motion*, at 12; *Loop Paper's Brief in Opposition*, at 4).  OBM is the "Official Board Markets" price range set for each particular paper product, while FAS is said to represent an export price, as opposed to a domestic price – as does "Expo" or "export."  (*Memorandum of Law in Support of JC Horizon's Motion*, at 2 n.1, 6 n.2).

These were the terms JC Horizon's counsel emailed to Loop Paper's counsel for confirmation the afternoon of August 7th, adding that the contract was to run until April 2011. What is immediately clear is that the supplemental dollars per tonnage, i.e., $38.00, $37.50 and $39.00/ton, varied numerically from the original contract, which specified $50.00, $55.00 and $45.00/ton. And, the term of the contract was no longer three years. Loop Paper's attorney responded by email: "[e]verything is fine," and "[a]ll other terms and conditions of the previous contract remain the same." The attorney for JC Horizon emailed back, adding terms for payment, and saying he would get Loop Paper's counsel "a draft of the contract and hopefully we can get this resolved shortly." (Hirsch Aff., Ex. B). His opposing counsel's reply was "[s]ounds good. We'll look for your draft." (Hirsch Aff., Ex. B). The parties contacted chambers by phone and reported that an agreement had been reach, and the settlement conference was unnecessary. I entered a minute order to that effect: "Parties telephonically report they have settled the case." (Dkt. # 33).

For whatever reason, contrary to JC Horizon's counsel's last email, Loop Paper's attorney put together the first draft, which altered the tonnages and the prices from the original contracts. He submitted it to opposing counsel on August 19th. The following chart helps to visualize the changes that were made. OBMCHS means Official Board Market Chicago High Side. This is a price term the briefs do not explain beyond that.

| ORIGINAL CONTRACT | | | | SETTLEMENT AGREEMENT | | | |
|---|---|---|---|---|---|---|---|
| Prod. | Min | Max. | Price | Product | | "Additional" | Price:Add'l |
| #8 | 500 | 1500 | OBM CHS + $50 | #8 | 250 OBMCHS + $38 | 250 | OBM "Expo" |
| #3 | 1000 | 3000 | OBM CHS + $45 | #3 | 500 OBMCHS + $37.50 | 500 | OBM FAS |
| #11 | 3000 | 3500 | OBM CHS + $45 | #11 | 1500 OBMCHS + $39 | 1500 | OBM Export |
| #9 | 500 | N/A | OBM CHS+ $55 | #9 | N/A | | |

For newspaper #8, under the paragraph captioned, "QUANTITY," the Loop Paper draft of the settlement agreement (which was actually the original contract edited) provided that the "Seller will supply and the Buyer will purchase a minimum 250 tons per month of Product and an estimated maximum 500 tons per month . . . ." (Hirsch Aff., Ex. D, at 1; *Loop Paper's Brief in Opposition*, Ex. 3). This differed from the initial contract, which required JC Horizon to purchase a minimum of 500 tons of #8 newspaper per month, while allowing it to purchase up to a maximum of 1,500 tons per month

Under the paragraph captioned, "MINIMUM TONNAGE PURCHASE REQUIREMENTS," the draft settlement agreement provided that JC Horizon guaranteed it would "purchase not less than 250 tons of material [#8] per month," and agreed it would be on the hook for the price of that quantity, even if it ordered less. (Hirsch Aff., Ex. D, at 2; *Loop Paper's Brief in Opposition*, Ex. 3). For mixed paper #3 and OCC #11, *combined*, the settlement agreement provided that the "Seller will supply and the Buyer will purchase a minimum 2000 tons per month of Product and an estimated maximum 4000 tons per month . . . ." (Hirsch Aff., Ex. E, at 1; *Loop Paper's Brief in Opposition*, Ex. 4). It further provided that JC Horizon guaranteed aggregate monthly purchases of #3 and #11 of 2000 tons. (Hirsch Aff., Ex. E, at 2; *Loop Paper's Brief in Opposition*, Ex. 4).

It is Loop Paper's contention that the so-called "additional" tonnage amounts of 250, 500, and 1500 would be sold to JC Horizon at Loop Paper's "discretion," based on fluctuating export prices and that the parties agreed to this when they got together to discuss settlement. (*See* Loop Paper's Brief in Opposition to Motion to Enforce Settlement, Ex. A, Declaration of George Ward, and Ex. B, Declaration of Jeffrey Godfrey).[3]

This is where the new problem came in. JC Horizon now says that Loop Paper's interpretation cut the minimums set in the original contract by half, and not only did it never agree to such a thing, it never had that in mind. How could it, it contends, for that would be a departure from the original contract's minimums. What JC Horizon contends it agreed to was the same minimum quantities as in the original contract, but at different prices. The first tonnage would be at OMB high side prices with the "additional" minimum tonnage at FAS prices. In short, it does not dispute the price it would have to pay, but merely its contractual right to buy the enhanced amounts contained in its draft of the settlement agreement and Loop Paper's correlative obligation to supply that combined amount. (*See Memorandum of Law in Support of JC Horizon's Motion*, at 7).

Given the obvious criticality of the terms of the settlement agreement that defined the mandatory quantities of product to be bought and sold, one might have expected precisely this explanation when JC Horizon responded by email a few days later to what it now contends was so significant and drastic a departure from the terms supposedly agreed upon at the parties' meeting. *Cf., Tober v. Graco Children's Products, Inc.*, 431 F.3d 572 (7th Cir. 2005); John W. Strong,

---

[3] Ms. Lee's affidavit, offered by JC Horizon, does not address the interpretation of the agreement, saying only that a settlement was reached at the morning meeting. (Lee Aff., ¶4). It is unclear whether Messrs. Ward and Godfrey's affidavits regarding the discretionary nature of the "additional" tonnage is simply their conclusion about what was agreed to or whether they are actually reporting on the words that were said by the participants. Consequently, the affidavits are not helpful.

McCormick on Evidence § 262 at 171 (5th ed.1999) McCormick on Evidence §262 at 171 (5th ed. 1999); *Ricciardi v. Children's Hosp. Med. Ctr.*, 811 F.2d 18, 24 (1st Cir.1987). Yet, that did not occur. The responsive email said the draft was under review and there were some questions involving a letter of credit provision and counsel for JC Horizon wanted to make sure they had the same understanding of the *price* terms – OBM Expo, OBM FAS, and OBM export. That was all, though. There was nothing about what are now claimed to have been the unauthorized and unagreed to cuts in the minimum, monthly tonnages. The email closed with, "[a]ssuming we are able to confirm the above, we should have our notes and comments on your drafts, along with a very simple mutual release, to you shortly." (*Loop Paper's Brief in Opposition*, Ex. C-5). It would certainly seem, then, that at that point, everything was alright as far as the monthly minimum provisions and Loop Paper's interpretation of the settlement agreement.

Apparently, the assurances JC Horizon asked for were gained, because when JC Horizon's counsel made changes, the only substantive ones affected tonnage. Significantly, the JC Horizon version changed ¶ 3, QUANTITY, so that the parties were respectively obligated to buy and sell "no less than 500 tons of product per month...." This doubled the monthly tonnage Loop Paper was obligated to sell under its draft of the settlement agreement and returned to the minimum quantities in the original contract. Paragraph 3 not only doubled the figures in the Loop Paper draft to 500 tons for #8 newspaper, it set 4000 tons for #3 and # 11, combined. However, in ¶6, the MINIMUM TONNAGE PURCHASE REQUIREMENTS provision, JC Horizon only guaranteed that it would purchase not less than 250 tons of material per month for # 8 newspaper, and that if it did not, it was obligated to pay for that tonnage anyway. But no more. And JC Horizon guaranteed that it would

purchase not less than 2000 tons per month of #3 mixed paper and #11 OCC, combined. (Hirsch Aff., Ex. G, at 1, 2; Ex. H, at 1, 2). This was the same as Loop Paper's draft.

Counsel for JC Horizon also deleted the provisions for maximums per month. (Hirsch Aff., Ex. G, at 1; Ex. H, at 1). He sent these edits to opposing counsel on August 26th, three days before a status hearing scheduled for the 29th. In the interim, Loop Paper did not respond to the changes. The minute order regarding the results of the status hearing states that the parties reported that the case was settled, the referral for a settlement conference was closed and the case was returned to the assigned judge. (Dkt. # 35). Both sides agree that they thought the case was, indeed, settled, (*Memorandum of Law in Support of JC Horizon's Motion*, at 8; *Loop Paper's Brief in Opposition*, at 5), despite the obvious discrepancies in the minimum monthly tonnages in the two drafts, not to mention the discrepancy in JC Horizon's draft.[4]

Apparently, Loop Paper still hadn't responded to the changes by September 17th, and JC Horizon's counsel sent his counterpart two additional drafts – neither party includes these in their exhibits – which set a much shorter six-month term for the agreement, according to JC Horizon's brief. (*Memorandum of Law in Support of JC Horizon's Motion*, at 8). Loop Paper's attorney responded in a letter dated September 25, 2009:

> Subsequent to our review of your modifications, you and I had telephone discussions and I explained to you that at no time was there ever an agreement between Loop and JC Horizon where the required minimums [for #8 newspaper] exceeded 250 tons of Newspaper per month or 2000 tons of combined Mixed Paper and OCC per month

---

[4] Because the parties canceled the settlement conference there was no opportunity to put the agreement on the record as *Lynch, Inc. v. SamataMason, Inc.*, 279 F.3d 487 (7th Cir.2002) recommends and as was done in *Wells Fargo*, 608 F.Supp.2d at 984. *See also Elustra v. Mineo*, 595 F.3d 689, 708 (7th Cir. 2010).

> (i.e., 500 & 1500 tons respectively). That was also consistent with the prior agreement. In addition, Loop would certainly be willing to sell your client additional tonnage each month for each commodity depending on our ability to secure the product. Our client has always maintained that they cannot agree to something that cannot be supplied.
>
> Following that discussion, you provided us with the most recent proposed agreements for New; Mixed Paper and OCC. In that agreement, the Term was modified to six months.
>
> Moreover, you have deleted the agreed pricing for the New; Mixed Paper and OCC on Exhibit A of this agreement. This new agreement is not consistent with my client's understanding of the discussions that occurred the day of the settlement conference.

(Hirsch Aff., Ex. I). He added that Loop Paper would be "willing to enter into the agreements we proposed immediately after settlement with required minimums set forth therein." (Hirsch Aff., Ex. I). Additional tonnage would be discretionary on both sides, and the parties could agree to review the terms every six months. (Hirsch Aff., Ex. I). He closed by saying if there was no agreement on these bases, Loop Paper would move forward with litigation.

JC Horizon's counsel wrote back on September 29th, expressing his clients's belief that the minimums on which the parties had agreed were set forth in Mr. Ward's notes, a copy of which he attached. He said that the minimum monthly tonnages were not merely the first figure reflected next to each category of paper and calculated at the OMB high side price, but rather were a combination of that figure plus the "Additional" tonnage per month calculated at OMB export price or OMB FAS price. It was JC Horizon's contention that when these figures were combined, the parties had agreed that the minimums that had to be provided by Loop Paper were 500 tons of Newspaper, and 4000 combined tons of Mixed Paper and OCC. (Hirsch Aff., Ex. J). Counsel said that he was confident the court would enforce the agreement under these terms, adding that "[a]ll subsequent negotiations

have been intended to memorialize that agreement and are not concession of anything." (Hirsch Aff., Ex. J). Then he wrote:

> With that proviso, JC Horizon still believes a final settlement agreement can be reached that does not involve a motion to enforce the August 7 settlement or additional litigation. We appreciate your client's proposal that the parties have discussions every six months during the term of any new contract relating to the possibility of modifications of the minimum requirements. Our client has taken your proposal under advisement, and we will respond as soon as possible.

(Hirsch Aff., Ex. J). He closed by saying that he would inform Judge Darrah that while JC Horizon thought there was an agreement, Loop Paper was backtracking, and that JC Horizon would be filing a motion to enforce the agreement in 30 days if things were not resolved. (Hirsch Aff., Ex. J).

And that's what happened. JC Horizon filed this motion, arguing for enforcement of a settlement agreement according to its interpretation of the terms. Loop Paper has opposed the motion and has insisted that its interpretation of the contract is the right one.

## II.
## ANALYSIS

### A.

Settlement agreements are contracts and are enforced as such, according to the applicable state law – which, here, is Illinois. *Holmes v. Potter*, 552 F.3d 536, 539 (7th Cir. 2008); *Newkirk v. Village of Steger*, 536 F.3d 771, 774 (7th Cir. 2008). If the subject matter implicates the statute of frauds, the agreement must be in writing. *Herrnreiter v. Chicago Housing Authority*, 281 F.3d 634, 638 (7th Cir. 2002); *Lynch, Inc. v. SamataMason Inc.*, 279 F.3d 487, 490 (7th Cir. 2002). Neither party raises the statute of frauds, however, because they both say an agreement was reached on August 7, 2009, between Mr. Ward and Ms. Lee, as evidenced by Mr. Ward's notes, and the follow-

up emails later that day. The follow-up emails set forth all material terms – price, required quantities of paper, length of contract – and incorporate the balance of the parties' initial sales agreements to fill in the rest.[5] The emails were exchanged between the parties' attorneys, evidencing assent to the terms of the deal. *Cloud Corp.*, 314 F.3d at 295 (sender's name on an e-mail satisfies the signature requirement of the statute of frauds).[6]

With the wording of their agreement not an issue, the dispute comes down to the meaning of the word, "additional." Under Illinois law, the interpretation of an agreement is governed by the parties objective expressions of intent. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 714 (7th Cir. 2009). "'Secret hopes and wishes count for nothing' because the 'status of a document as a contract depends on what the parties express to each other and to the world, not on what they keep to themselves.'" *Newkirk,* 536 F.3d at 774. So we don't take "a tour through [a party's] cranium, with [the party] as the guide." *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814 (7th Cir. 1987). In short, in Illinois as in elsewhere, it is objective intent that governs, *Newkirk,* 536 F.3d at 774, not some subjective theory of "meeting of the minds" that determines whether contract formation has

---

[5] The parties do not get into it, but their settlement agreement, being a contract for the sale of goods in excess of $500, implicates the statute of frauds. UCC §2-201. In her affidavit, Ms. Lee makes a point of saying that Mr. Ward gave her a copy of his notes. (Lee Aff., ¶ 4). But the notes are not signed, so even though they may memorialize the price and quantity terms of the parties' agreement, they are, *in and of themselves*, ineffective under the statute of frauds to bind Loop Paper. *Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 295 (7th Cir. 2002). But the parties concession there was an agreement satisfies the statute of frauds. *Consolidation Services, Inc. v. KeyBank Nat. Ass'n*, 185 F.3d 817, 821 (7th Cir.1999).

[6]Neither side disputes counsels' authority to bind them to a settlement.

occurred. *See* discussion *infra* at 25. And so, we look to the emails the parties say evinces the terms of their settlement agreement.[7]

For each type of product, Mr. Ward's notes reflect one quantity at one price, and a second, identical quantity at a different price. The second quantity is referred to in the notes as "additional." For example, for newspaper, it's 250 tons per month at one price with an "additional" 250 tons at another price. JC Horizon interprets this as mandating a monthly minimum of 500 tons. In other words, the separate 250 tonnages are to be combined, with half the tonnage at one price and the other half at a different price. Loop Paper argues that the monthly minimum is 250 tons, with any "additional" tonnage up to another 250 tons to be available for purchase, but only if Loop Paper chooses to sell an amount at an excess of 250 tons per month minimum. Of course, both parties concede that any sales above 250 tons of newspaper will be at the prescribed, OMB Export or FAS price, rather than the OMB high side price.[8]

To support their positions, the parties look first to the dictionary definition of "additional." That's a good start, because courts interpret contracts with the goal of effectuating the parties' intent, giving contract terms their plain and ordinary meaning. *Kim v. Carter's Inc.*, – F.3d –, –, 2010 WL 890706, *2 (7th Cir. 2010); *Hot Light Brands, L.L.C. v. Harris Realty Inc.*, 392 Ill.App.3d 493, 912 N.E.2d 258, 263 (2009). *Webster's Encyclopedic Unabridged Dictionary* (1989) defines "additional" as "added" or "supplementary." That suggests that the parties were concerned with a

---

[7] A series of emails can comprise a contract. *See e.g., Nomanbhoy Family Ltd. Partnership v. McDonald's Corp.*, 579 F.Supp.2d 1071 (N.D.Ill. 2008).

[8] The parties do not explain the significance of the two prices in terms of which is the higher or generally higher price, other than saying that both prices fluctuate. (*Loop Paper's Brief in Opposition*, at 7; *Reply Memorandum*, at 5). Not being in the paper business, a court could use such information to assess the parties' positions through a lens of what makes sense commercially; but more on that later.

primary amount – the minimum or initial tonnage – to which a secondary or "supplementary" amount *could* be added. It is a reasonable interpretation, and one that does not strain the ordinary meaning of the word.

Faced with this definition – on which Loop Paper relies in its brief – JC Horizon dissects the word "additional" and argues that the dictionary definition of "add" – is "to join or unite so as to increase quantity." (*Reply Memorandum*, at 5). The idea is that one is to add the two amounts together to increase quantity. From there, JC Horizon curiously and inconsistently moves on to submit that "additional" does not necessarily carry with it the meaning that additional tonnage was at Loop Paper's discretion; it could just as easily have been at JC Horizon's discretion. (*Id.*). That is certainly true, and precisely the point Loop Paper makes. But investing JC Horizon with "discretion" to place additional orders does not mean that Loop Paper lost its discretion to reject orders for "additional" tonnage. Indeed, such a conclusion is logically and grammatically indefensible.

Moreover, the interpretation that JC Horizon had the discretion to order a second 250 tons of newspaper is a completely different theory than that Loop Paper had the contractual obligation to supply that additional amount if JC Horizon chose to order it. And it is certainly different than the theory that JC Horizon was contractually required to purchase 500 tons, rather than 250 tons per month. JC Horizon's interpretation is unconvincing – especially, given the manner in which the parties had set up their previous agreements, with both parties subject only to the monthly minimums, and each party having the discretion as to how to deal with amounts above the minimums and up to the "estimated maximums." The monthly estimated maximums were discretionary

tonnages and the contracts expressly provided that they were intended to accord flexibility to Loop Paper.

The structure of the original contracts is significant. "'In order to gain the fullest understanding possible of the parties' agreement and their purpose, we often must consider the course of dealings between the parties and the totality of the business relationship.'" *Commodity Futures Trading Com'n v. Zelener*, 387 F.3d 624, 626 (7th Cir. 2004). JC Horizon's initial position – that "additional" tonnage was merely a signal of a two-tier pricing system and the monthly minimum tonnage Loop Paper was obligated to sell and JC Horizon was obligated to purchase were a combination of the two amounts – arguably has some appeal. But it, too, makes little sense given the parties' past relationship and problems.

JC Horizon also argues that Loop Paper's interpretation renders the "second, fourth, and sixth lines [i.e., the "additional" tonnage figures in the notes]. . . meaningless surplusage . . . ." (*Memorandum of Law in Support of JC Horizon's Motion*, at 12). Of course, a contract cannot be interpreted in such a way, *BKCAP, LLC v. CAPTEC Franchise Trust 2000-1*, 572 F.3d 353, 362 (7th Cir. 2009), but JC Horizon does not offer an explanation for why that would be the result if Loop paper's interpretation prevailed. Here is its theory:

> Ward's notes . . . did not qualify the second 50% of each quantity of paper, and only indicated a difference in price, not in obligation, between the first 50% and second 50% of the quantities of each product. His lawyer's confirming email offered no qualifications, either, and in fact counsels' exchange used the term "additional" to refer to the second price, which contemplates JC Horizon purchasing quantities in excess of the first 50% .

(*Memorandum of Law in Support of JC Horizon's Motion*, at 12).

This reasoning does not support the conclusion and render the "additional" amount surplusage. For that to occur, the second tonnage amounts would have to have no meaning or have no effect on the agreement if they were deleted. But that is manifestly not the case. There is an initial mandatory amount, and an "additional" amount that JC Horizon can buy at its discretion so long as Loop Paper chooses to sell that or some lesser amount to JC Horizon. If that occurs, the second 250 tons (or some fraction thereof) is priced differently than the initial 250 tons. The same holds true for purchases of ##3 and 11 mixed and OCC. Hence, it is inaccurate to say that the additional tonnage amounts are rendered surplusage.[9]

The basic approach of the settlement agreement is consistent with the overall design of the parties' earlier sales contracts, which provided for not only minimum monthly amounts that had to be purchased, but maximum monthly tonnages up to which the parties had discretion to buy and sell, depending on the buyer's needs and the seller's ability to fill the orders. The minimum tonnage figures proved unworkable. The parties' difficulties under their prior arrangement are significant in determining the meaning of the settlement agreement. When interpreting a contract, the parties' intent can be discerned not just from express language, but the circumstances surrounding their transaction. *In re Estate of Gallagher*, 383 Ill.App.3d 901, 905, 890 N.E.2d 1249, 1253 (1st Dist. 2008); *Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill.App.3d 605, 614, 863 N.E.2d 743, 753 (1st Dist. 2007). That means the court doesn't interpret the contract in a vacuum. *Nicor, Inc. v. Associated Elec. and Gas Insurance. Services Ltd.*, 223 Ill.2d 407, 417, 860 N.E.2d 280, 286 (2006); *Tice v. American Airlines, Inc.*, 288 F.3d 313, 316 (7th Cir. 2002). It has to place itself in the position of the parties. *Intersport, Inc. v. National Collegiate Athletic Ass'n*, 381 Ill.App.3d 312,

---

[9] The settlement agreement is silent on pricing of any orders in excess of the "additional" tonnages.

319, 885 N.E.2d 532, 539 (1st Dist. 2008). This is not a new concept. Learned Hand explained it long ago:

> The issue involves the baffling question which comes up so often in the interpretation of all kinds of writings: how far is it proper to read the words out of their literal meaning in order to realize their overriding purpose? * * * When we ask what (was) 'intended,' usually there can be no answer, if what we mean is what any person or group of persons actually had in mind. Flinch as we may, what we do, and must do, is to project ourselves, as best we can, into the position of those who uttered the words, and to impute to them how they would have dealt with the concrete occasion.

*United States v. Klinger*, 199 F.2d 645, 648 (2nd Cir. 1952)(quoted in *U.S. Trust Co. of N. Y. v. Jones*, 414 Ill. 265, 270-271, 111 N.E.2d 144, 147 (1953)).

And we know that a contract should not be read to produce an interpretation that might fit the words, but make no commercial sense. *American Intern. Specialty Lines Insurance. Co. v. Electronic Data Systems Corp.*, 347 F.3d 665, 670 (7th Cir. 2003); *Great West Casualty Co. v. Mayorga*, 342 F.3d 816, 818 (7th Cir.2003). Nor should a construction be given the words that make no common sense. "There is no novelty in interpreting contractual language in the light of common sense." *McElroy v. B.F. Goodrich Co.*, 73 F.3d 722, 726-27 (7th Cir.1996). "'All interpretation is contextual, and the body of knowledge that goes by the name of common sense is part of the context of interpreting most documents, certainly most business documents.'" *Vendetti v. Compass Environmental, Inc.* 559 F.3d 731, 733 (7th Cir.2009). Indeed, it "'is as much a part of contract interpretation as is the dictionary or the arsenal of canons.'" *Dispatch Automation, Inc. v. Richards*, 280 F.3d 1116, 1119 (7th Cir.2002). *See also Fidelity and Deposit Co. of Maryland v. Rotec Industries, Inc.*, 392 F.3d 944, 949 (7th Cir.2004)("To spare contracting parties the expense and uncertainty and other angst of trial, courts endeavor, as we have just noted, to resolve contract

disputes on the basis of the language of the contract, supplemented by commercial or common sense – hence as a 'question of law,' which just means that it is to be answered without a trial.").

Here, the difficulties that plagued the parties prior commercial relationship must be considered in interpreting their efforts to provide against a repetition of those difficulties. With that as the backdrop, JC Horizon's interpretation of "additional," is, at best, exceedingly strange and strained. And it is so whether viewed from the vantage point of common or commercial sense. It was not as though the settlement agreement was a commercial undertaking between strangers. Quite the contrary. The parties had months of unsatisfactory involvement, and the performances under their contracts led to mutual recriminations, mutual disappointments, and ultimately to a lawsuit largely over the single issue of the ability of Loop Paper to supply product and the willingness or ability of JC Horizon to purchase amounts for which it had contracted. Loop Paper sued JC Horizon, alleging that they "repeatedly failed to purchase monthly minimum tonnages" even though Loop Paper was "ready willing and able to supply . . . the minimum and maximum paper tonnages." (*Complaint*, ¶¶ 4-5). JC Horizon's counterclaim alleged that Loop Paper "failed to supply JC Horizon with it requested quantity of newspaper." (*Counterclaim*, ¶ 11). So neither party thought the other was meeting the monthly minimum of 500 tons of Newspaper #8.[10]

It makes no sense – common or commercial – to suggest that just nine months after they came to blows over the 500-ton-per-month minimum that the parties would kiss, make up, and go right back to that figure. Why would either side agree to such a thing when, at least from each party's perspective the other could not meet the minimum requirement under the contract? And why

---

[10] Under the original sales agreement, the monthly estimated maximum was 1500. (*Memorandum of Law in Support of JC Horizon's Motion*, Ex. A at 1& Ex. A-A).

would they have labored over new drafts when all that was necessary was a simple amendment to Exhibit A to the sales agreements that set forth new prices. The answer is that sophisticated commercial entities would not have done so, and no reason is offered by JC Horizon as to why they would have.[11]

Moreover, JC Horizon's construction of the settlement agreement injects an asymmetry to which Loop Paper never would have agreed. The estimated maximums in the original contract were optional, as opposed to mandatory, for good reason. As the initial contracts stated, they "allow for fluctuation in the Seller's ability to produce an exact maximum volume during a given month...." There is absolutely nothing to support the notion that the parties' settlement agreement was intended to or would have *required* Loop Paper to sell the same amount of #8 newspaper it was required to sell under the original contract, while obligating JC Horizon only to order and pay for half that amount. Yet, that is exactly the position in which acceptance of JC Horizon's construction of the settlement agreement would leave the parties. Under the original contract, the minimum tonnage Horizon was required to buy and Loop Paper was obligated to sell was 500 tons per month. Under JC Horizon's view of the settlement agreement Loop Paper is still required to sell 500 tons per month, but it is only obligated to purchase 250 tons. This is contrary to both commercial and common sense.

The following chart summarizes the original sales contracts, Loop Paper's settlement interpretation of the settlement agreement and JC Horizon's interpretation.

---

[11] JC Horizon does point out that the pricing changed, but goes not further than that, stopping short of explaining how that might account for a return to the same monthly minimums that previously were nothing but trouble for both parties. Moreover, while price is always a key component of a business agreement, given the parties' history and the reasons that led to the litigation, no term was of greater significance than quantity.

| | Original Sales Contracts | Loop's Settlement Draft | Horizon's Settlement Draft |
|---|---|---|---|
| Qty | | | |
| # 9 News | 500min./1500 max | 250 min/500 max | 500 min / no max |
| Min | | | |
| Tonnage Pymt | 1500 | 250 | 250 |
| Mixed | 1000 min/1500 max | 500 min. | 1000 min |
| OCC | 3000 min/3500 max | 1500 min. | 3000 min |
| Combo | 4000 min/5000 max | 2000 min/4000 max | 4000 min/no max |
| Min | | | |
| Tonnage Pymt | 4000 combo | 2000 combo | 2000 combo |

In its reply brief, JC Horizon argues that it would make no sense for the parties *not* to return to their original monthly minimums, and that the settlement agreement terms *must* be read as being the same as the original sales agreements. (*Reply Memorandum*, at 4 & n.4). Even though the value of any conclusion is proportional to the sources that sustain it, the reply brief contains nothing beyond the mere assertion, and it ignores the price changes between the original contracts and the settlement agreement.

The reply brief also states that Loop Paper's interpretation "is also wholly inconsistent with Loop Paper's complaint in this case, in which it alleges that JC Horizon breached the parties' prior contracts for failure to purchase those quantities and alleges that Loop Paper is entitled to liquidated damages based on those tonnages." (*Reply Memorandum*, at 4 n.4). But neither the relevance of the observation nor its logic is apparent. More importantly, it is JC Horizon's interpretation of the settlement agreement that is inconsistent with the Complaint, not Loop Paper's. It is precisely because JC Horizon allegedly failed to purchase the prescribed minimums in the initial contracts that it makes no commercial sense to insist that Loop Paper would have entered into a settlement

agreement that maintained those very amounts. Conversely, halving those minimums is perfectly consistent with the allegations of the Complaint. In short, the argument advanced by JC Horizon is self-refuting and supports Loop Paper's interpretation of the settlement agreement.

In short, it made perfect sense for Loop Paper to have receded from the terms of the original sales agreement and the demands of its Complaint and to have reduced the monthly minimums – effectively by 50%. It also made perfect sense that JC Horizon would have agreed to those reductions, for if the Complaint is to be credited, the initial minimum tonnages were proving burdensome. And, if the allegations of the counterclaim are to be credited, those minimum tonnages were proving burdensome to Loop Paper. Hence, there was ample reason for both sides to have agreed to the reductions in the minimum tonnages set forth in the settlement agreement.

JC Horizon's contrary arguments are unamplified and thus fall within the orbit of the rule that "[p]erfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived." *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009). *See also White Eagle Co-opinion Ass'n v. Conner*, 553 F.3d 467, 476 n. 6 (7th Cir. 2009). *United States v. Haynes,* 582 F.3d 686, 704 (7th Cir.2009); *United States v. Hook,* 471 F.3d 766, 775 (7th Cir.2006).

Finally, JC Horizon's *ipse dixits* in its Reply Brief also ignores the reality that a settlement agreement is generally not a return to the conditions that prompted litigation in the first place. Nor is it the vehicle by which a party can expect to achieve everything it hoped to achieve in the case. In that sense, settlement agreements are like consent decrees, which are the product of compromise of the parties' inevitably clashing and divergent interests. They cannot be construed as though it were a reflection of the maximum aspirations of one side or a reflection of what might have been achieved had the particular issues resolved by the consent order been played out to their ultimate

conclusion. *White v. Roughton,* 689 F.2d 118, 119-20 (7th Cir.1982). For obvious reasons, the exercise of amicably resolving a case is called *settling* a lawsuit, not *winning* a lawsuit

## B.

In the context of a settlement agreement, as in any other contractual setting, post-acceptance conduct does not retract an earlier acceptance. *Elustra,* 595 F.3d at 709. This principle is significant in assessing what occurred after the parties had canceled the settlement conference and informed the court the case was settled. Parties negotiating a contract can make their agreement contingent on the execution of a formal, written document. *PFT Roberson, Inc. v. Volvo Trucks North America, Inc.,* 420 F.3d 728, 731 (7th Cir. 2005); *Quake Construction, Inc. v. American Airlines,* 141 Ill.2d 281, 287, 565 N.E.2d 990, 993 (1990). Until then each party is "free to walk away...." *Solaia Technology LLC v. ArvinMeritor,* 2006 WL 695699 at *10 (N.D.Ill.2006)(Filip, J.). The principle is of ancient vintage. *See South Boston Iron Co. v. U.S.,* 118 U.S. 37 (1886); *Ambler v. Whipple,* 87 U.S. 546, 556 (1874)("Admitting all this to be true, it is very clear that both parties intended to have a written instrument signed by each as the evidence of any contract they might make on that subject, and neither considered any contract concluded until it was fully executed. Under these circumstances Ambler had a right to decline to sign the paper, and until he signed he was not bound by it.").

There are no magic words required to make an agreement contingent on a final, written document. "Words expressing contingency or dependence on a subsequent event or agreed-on element will do." *PFT Roberson,* 420 F.3d at 732. But here, unlike *PFT Roberson,* where there was no evidence the parties had agreed on all the necessary terms, the email exchanges evidenced agreement on quantity, price, term, and all the remaining details were simply carried over from the previous sales agreements. Indeed, the initial drafts submitted by the parties utilized the initial

contracts. This was a case of the parties anticipating a more formal future writing,[12] as opposed to one mandating execution of a formalized agreement as a condition precedent to contract formation. The former does not nullify an otherwise binding agreement. *Abbott Laboratories v. Alpha Therapeutic Corp.*, 164 F.3d 385, 388 (7th Cir. 1999). *See also American Smelting & Refining Co. v. U.S.,* 259 U.S. 75, 78 (1922)(Holmes, J.)("Of course the expressed contemplation of a more formal document did not prevent the letters from having the effect that otherwise they would have had.").

Neither side argues that the absence of the execution of a formal contact precludes contract formation. Quite the contrary. Both sides submit that they had a binding contract on August 7th and they continue to vigorously defend their respective interpretations of that binding contract. To the extent that an argument might have been made that there was no settlement agreement because a formal written contract was not executed, it has been waived. *United States v. Wesley*, 422 F.3d 509, 520 (7th Cir. 2005)("A forfeiture is basically an oversight; a waiver is a deliberate decision not to present a ground for relief that might be available in the law.").

The record reveals that rather than making their agreement contingent on a formal document, it seems as though the parties, having already agreed to terms by objective signs, started a new fight over the monthly minimums through their exchange of drafts, with JC Horizon surprising Loop Paper by returning to the monthly minimums that brought the two sides to court in the first place. But JC Horizon argues that the drafts are essentially meaningless because once the agreement was reached on August 7, it could not be undone by a "contentious exchange of written drafts," citing

---

[12] JC Horizon's attorney said that he'd draft an agreement and that "hopefully, [the parties] could this thing resolved shortly." (Hirsch Aff., Ex. B). Loop Paper's counsel said he would look for that draft. (Id.)

*Dillard v. Starcon Intern., Inc.*, 483 F.3d 502 (7th Cir. 2007) (*Reply Memorandum*, at 8). That is certainly true.

But *Dillard* is not particularly helpful here because the "contentious drafts" in that case demonstrated a dispute limited to immaterial terms. 483 F.3d at 507-08. The drafts JC Horizon and Loop Paper exchanged differed in the most material of terms: quantity. Still, it was a term that the parties, through their objective expressions, had agreed upon. The question that arises is whether the drafts are nothing more than expression of the subjective beliefs of the parties regarding the meaning of the language covering that term which, as already indicated, do not come into play in the interpretation of their agreement. Or, was this a case of buyer's or seller's remorse? "[J]udges have no way of crawling into peoples' minds; They act on the basis of external signs." Posner, Overcoming Law, 276 (1995). And, of course, a contracting party cannot be expected to "peak into" the other's "mind and discover" that it had a different view of the terms than stated in the contract. *ConFold Pacific, Inc. v. Polaris Ind.*, 433 F.3d 952 (7th Cir. 2006). It is for that very reason that the law long ago rejected the notion that there must be a subjective meeting of the minds of contracting parties in place of an objective theory of intent. *See Newkirk*, 566 F.3d at 774; *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009 (3rd Cir. 1980).

And it is that objective theory of intent that compels rejection of Loop Paper's apparently alternative theory that if JC Horizon's interpretation of the settlement agreement is right, there was no agreement because there was no "meeting of the minds." Although it is a handy shorthand, the phrase, meeting of the minds, is misleading if taken literally. *See Laserage Technology Corp. v. Laserage Laboratories, Inc.*, 972 F.2d 799, 802 (7th Cir. 1992). Today, there is no debate that the formation of a contract does not actually require that the parties come to a subjective and congruent

understanding about the meaning of terms. Rather, there is common agreement that "no one will understand the true theory of contract or be able to discuss some fundamental questions intelligently until he has understood that all contracts are formal, that the making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs not on the parties having meant the same thing but on their having said the same thing." Holmes, *The Path of the Law*, 10 Harv.L.Rev. 457, 464 (1897). *See also Dillard*, 483 F.3d at 507; *Navair, Inc. v. IFR Americas, Inc.*, 519 F.3d 1131, 1139 (10th Cir.2008)("Put another way, the inquiry will focus not on the question of whether the subjective minds of the parties have met, but on whether their outward expression of assent is sufficient to form a contract."). *See also Goode v. Riley*, 153 Mass. 585, 586, 28 N.E. 228 (1891) (Holmes, J.).[13]

In the end, whatever the parties conduct was subsequent to their settlement agreement on August 7th – and both sides say they had one as of that day – it does not affect the resolution of this motion. Only JC Horizon seeks enforcement of the settlement agreement, and its arguments in favor of its interpretation fail. Consequently, its motion must be denied. However, this does not mean that Loop Paper is free to return to the lists. The only way that that could occur would be if there were no settlement agreement. But Loop Paper insists, quite correctly, there is.

What happens next procedurally is that the referral from Judge Darrah will be closed, the motion having been decided. The parties' limited consent does not allow me to take action that will

---

[13] Loop Paper's "meeting of the minds" argument is approximately a half-page long and cites one lower court case, which merely alludes to the requirement that there must be a meeting of the minds as a prerequisite to contract formation.

formally resolve the case. Only Judge Darrah can do that, absent some further action by the parties that would confer additional authority for me to act.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 4/22/10