UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| **LOOP PAPER RECYCLING, INC., an Illinois Corporation,** | ) ) ) ) | |
| Plaintiff/Counter-Defendant, | ) ) | **Case No. 08 CV 07364** |
| v. | ) ) ) | |
| **JC HORIZON LTD., d/b/a JC HORIZON, LTD., a California Corporation,** | ) ) ) ) | |
| Defendant/Counter-Plaintiff. | ) ) | |

DEFENDANT JC HORIZON LTD.'S
LOCAL RULE 56.1(a)(1)(3) STATEMENT OF FACTS

JC Horizon Ltd. respectfully submits the following statement of undisputed material

facts:

**The Parties, Jurisdiction, and Venue.**

1.      JC Horizon Ltd. ("JC Horizon") is a California corporation, with its principal

place of business in Arcadia, California.  *See* Lee Dep. (Ex. 14) at 10:11-13[1], *see also* Ex. 5, ¶ 12.

JC Horizon is an exporter of recycled paper, metal, and plastic products.  *See* Lee Dep. Ex. 14 at

15:14-19, 64:23-35.

2.      JC Horizon's President is Judy Lee ("Lee").  Lee Dep. at 10:8-10.

3.      Loop Paper Recycling, Inc. ("Loop Paper") is an Illinois corporation, with its

---

[1]      All non-deposition exhibits are cited by number, per the attached index.  All
depositions excerpts are cited in the form of Name Dep. at Page : Line Number(s), except that
Jeffrey Godfrey's second deposition is cited as "Godfrey Damages Dep."

1

principal place of business in Chicago, Illinois.  *See* Godfrey Dep. at 22:23-23:7.  *See also* Ex. 2 ¶ 11; Ex. 6 at 1.  Loop Paper is a paper recycling and distribution company.  *See* Godfrey Dep. at 19:11-16.  *See also* Ex. 2 ¶ 11.  Loop Paper buys, packages, and sells paper.  Godfrey Dep. at 19:11-16.

4.      George Ward ("Ward") is Loop Paper's President.  Ward Dep. at 8:11-13.  Jeffrey Godfrey ("Godfrey") is the CFO of Draw Enterprises III, which is Loop Paper's management company.  Godfrey Dep. at 8:2-10:7.  Steve Sulli ("Sulli") was, at all relevant times, Loop Paper's general operations manager.  Ward Dep. at 14:10-13.

5.      Jurisdiction is proper because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.  *See* Ex. 6 at 1; Ex. 7; Ex. 10; Godfrey Dep. at 22:23-23:7; Lee Dep. at 10:11-13.  *See also* Ex. 2 ¶¶ 9, 11; Ex. 5 ¶¶ 9, 12.

6.      Venue in this District is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District and because the two contracts at issue provide for the commencement of legal action in this District.  *See* Ex. 2 ¶ 10 & Ex. A, Ex. B; Ex. 5 ¶ 10.

**JC Horizon and Loop Paper Enter into Two Agreements.**

7.      On April 19, 2008, JC Horizon and Loop Paper entered into two agreements for the sale and purchase of various paper products, each purportedly effective May 1, 2008 (the "Agreements").  Ex. 2 at Ex. A, Ex. B; Ex. 3; Ex. 4; Ward Dep. at 21:9-22:17.

8.      The first agreement was for the purchase and sale of paper products called "Newspaper Number 8" and "Newspaper Number 9," or "News 8" and "News 9," for short.  Ex. 3  ("Newspaper Agreement").  The numbers "8" and "9" refer to different qualities of

2

newspaper as described in the Paper Stock Institute of America, Standards and Practices Circular

("Circular"), which is incorporated by reference into the Agreements. *See id.* ¶ 1.  The

Newspaper Agreement was signed by Lee and Ward and was attached as Exhibit A to Loop

Paper's First Amended Complaint. *Id.*; Lee Dep. at 64:9-14; Ward Dep. at 21:9-22:17.

        9.      The second agreement was for the purchase and sale of old corrugated cardboard

("OCC")  and mixed paper ("MXP"), called "OCC 11" and "MXP 1," for short.  Ex. 4 ("Mixed

Paper Agreement").  The numbers "11" and "1" are taken from the Circular.  *See id.* ¶ 1.  The

Mixed Paper Agreement was signed by Lee and Ward and was attached as Exhibit B to Loop

Paper's First Amended Complaint. *Id.*; Lee Dep. at 64:9-14; Ward Dep. at 21:9-22:17.

        10.     The Mixed Paper Agreement calls for JC Horizon to purchase 3,000 tons of OCC

and 1,000 tons of Mixed Paper each month.  Ex. 4 at Ex. A.

        11.     The Agreements provide that "[t]he Buyer agrees to purchase and Seller agrees to

sell quantities within the minimum and estimated maximum range each month."  Ex. 3 ¶ 3;

Ex. 4 ¶ 3.

        12.     The Agreements purport to run for three years, from May 1, 2008 to April 30,

2011.  Ex. 3 ¶ 2; Ex. 4 ¶ 2.

**The Agreements Have Identical Liquidated Damages Provisions.**

        13.     The Agreements contain an identical paragraph captioned "Default/Termination":

> Only upon material breach or default of the terms of this agreement by either
> party and after such breach or default remains in effect for a period of thirty
> (30) days from the date of receipt of a written notice from the other party, the
> other party shall be entitled to (i) termination of this agreement and a claim
> for damages or (ii) abide by the terms and conditions of this agreement and
> claim specific performance with or without the option of damages.  In the
> event Buyer defaults and remains in default beyond the cure period, it is

agreed and understood that Buyer shall then pay to Seller damages calculated under the following formula: The average monthly minimum tons multiplied by $25.00 multiplied by the number of months remaining in the agreement.

Ex. 3 ¶ 13; Ex. 4 ¶ 13 ("Liquidated Damages Provisions").

14.     The Agreements state that they "shall be governed by and construed in accordance with" Illinois law.  Ex. 3 ¶ 14; Ex. 4 ¶ 14.

15.     Godfrey participated in the drafting and negotiating of the Agreements.  Godfrey Dep. at 14:11-19, 84:14-85:2.

16.     Loop Paper's lawyer, Matthew Carmody, drafted the Agreements.  Ward Dep. at 22:18-21.

**In October 2008, Loop Paper Terminates the Agreements.**

17.     Pursuant to the Agreements, on a month-to-month basis, JC Horizon submitted purchase orders to Loop Paper for certain amounts of each type of paper, and Loop Paper would attempt to fill those purchase orders.  Sulli Dep. at 20:23-21:13.

18.     By October 15, 2008, JC Horizon had not submitted purchase orders for what Loop Paper believed to be the minimum amounts JC Horizon was required to purchase for October 2008.  Ex. 11 at JCH 667; Sulli Dep. at 93:11-97:17.

19.     On that date, Sulli of Loop Paper e-mailed Lee of JC Horizon, asking whether JC Horizon was going to order paper to satisfy its obligations for that month.  Sulli Dep. at 93:15-94:2; Ex. 11 at JCH 667.  Sulli wrote, "I need to hear from you today in writing or I will pass this to our legal department for further action."  Ex. 11 at JCH 667; Sulli Dep. at 93:15-94:2.

20.     Sulli's October 15, 2008 email, Bates-labeled JCH000667 and previously marked as Godfrey Deposition Exhibit 1, is an authentic document, a true and correct copy of which is

4

attached hereto as Exhibit 11.  Sulli Dep. at 92:4-94:2.

21.     JC Horizon ordered some paper from Loop Paper in October, but Loop Paper found those orders to be insufficient to meet JC Horizon's obligations for that month.  Godfrey Dep. at 199:8-13; Ward Dep. at 119:3-11.

22.     JC Horizon has not issued any purchase orders for paper from Loop Paper since mid-October 2008.  Godfrey Dep. at 199:8-13.

23.     By October 28, 2008,  Loop Paper believed JC Horizon to be in default under the Agreements.  Ward Dep. at 120:14-17.

24.     Loop Paper claims it gave written notice of default to JC Horizon on or about that date.  *See* Ward Dep. at 120:14-17, 140:4-8.

25.     From October 28, 2008 to December 24, 2008, JC Horizon submitted no purchase orders to Loop Paper, and Loop Paper shipped no paper to JC Horizon. Ward Dep. at 127:2-8.

**Loop Paper Immediately Collects $550,000 from JC Horizon.**

26.     Per the Agreements, at their outset, JC Horizon posted a $550,000 standby letter of credit for the benefit of Loop Paper.  Ex. 3 ¶ 4; Ex. 4 ¶ 4.

27.     This standby letter of credit was a "guaranty of the payment terms or the payment of damages as set forth in [Paragraph] 13 herein."  Ex. 3 ¶ 4; Ex. 4 ¶ 4.

28.     Loop Paper did not take any portion of the letter of credit before November 7, 2008.  *See* Ward Dep. at 100:10-103:4.

29.     From November 7, 2008 to December 17, 2008, Loop Paper took all $550,000 of JC Horizon's letter of credit.  Godfrey Dep. at 157:11-17; Ward Dep. at 90:9-11, 104:1-19, 123:5-10.  Loop Paper now claims this money as compensation for its damages. Ex. 10; Godfrey

Damages Dep. at 88:7-20.

**Loop Paper Sues JC Horizon for Liquidated Damages.**

30.     Under the Liquidated Damages Provisions of the Agreements, Loop Paper could either terminate the Agreements and sue for damages or it could seek specific performance. Ex. 3 ¶ 13; Ex. 4 ¶ 13.

31.     Loop Paper elected to terminate the Agreements and sue for money damages only. On December 24, 2008, it filed its "Complaint at Law" against JC Horizon in this Court.  Ex. 1. It has not asked for specific performance of the Agreements, nor does it seek actual damages. Ex. 1; Ex. 2; Godfrey Damages Dep. at 51:10-52:8, 58:5-13, 71:8-72:18.

32.     In its Complaint, Loop Paper quotes from the Liquidated Damages Provisions, highlighting that "if JC Horizon defaults and remains in default beyond the cure period of 30 days, JC Horizon shall pay Loop Paper damages in the amount of the average monthly minimum tons multiplied by \$25.00 multiplied by the number of months remaining in the agreement." Ex. 1 ¶¶ 22, 37; Ex. 2 ¶¶ 26, 41.

33.     Loop Paper also alleges that "JC Horizon has breached [the Agreements] with Loop Paper by failing to purchase the minimum monthly tonnages, or by paying damages in accordance with the formula set forth in Paragraph 13 of the [Agreements] because it has been in default for more than 30 days."  Ex. 1 ¶¶ 23, 38; Ex. 2 ¶¶ 27, 42.

34.     In its answer to Loop Paper's complaint, JC Horizon asserted numerous defenses, including that "Loop Paper cannot recover any damages relating to [the Agreements] because those agreements contain liquidated damages clauses that are unenforceable penalties."  *See* Ex. 5 at 13 ("Seventh Defense").

6

**Loop Paper Describes the Liquidated Damages Provisions As a "Penalty."**

35.    Godfrey is the CFO of Draw Enterprises III, which is Loop Paper's management company, and does the accounting and financials for Loop Paper.  Godfrey Dep. at 7:3-8:3, 9:1-4.

36.    Godfrey was part of the Loop Paper team that negotiated and drafted the Agreements, and is Loop Paper's designated damages witness.  Godfrey Dep. at 14:11-19, 84:14-85:2; Godfrey Damages Dep. 4:18-21.  He has performed four damages analyses on behalf of Loop Paper for this case.  *See* Ex. 7 at LPR 2-4 ("First Analysis"); Ex. 8 at LPR 337-38 ("Second Analysis"); Ex. 9 ("Third Analysis"); Ex. 10 ("Final Analysis"); Godfrey Dep. at 93:14-23, 113:2-6; Godfrey Damages Dep. at 5:16-6:24, 38:5-13, 51:10-23.  True and correct copies of Godfrey's damages analyses are attached hereto as Exhibits 7 through 10.

37.    In Loop Paper's First Analysis, Godfrey calls the damage formula in the Liquidated Damages Provisions a "penalty."  Ex. 7 at LPR 2 ("Penalty ($25) for shortfall tons"); Godfrey confirmed this description in his deposition. Godfrey Dep. at 133:17-134:2, 135: 2-14.

38.    Godfrey also testified that the rationale of the Liquidated Damages Provisions was to make sure that JC Horizon purchased the paper that it was required to purchase under the contracts.  Godfrey Dep. at 137:13-18.

39.    On April 6, 2011, Godfrey updated his damages analysis.  *See* Ex. 8 at LPR 337. In this second analysis, Godfrey created a table captioned "Penalty Calculation Per Contract," which contains his calculation of the Liquidated Damages Provisions' formula.  *Id*.  This table contains his calculation of the Paragraph 13 formula, the sum of which he calls the "Total Penalty."  Godfrey Damages Dep. at 55:4-24; Ex. 8 at LPR 337.  Godfrey refers to the Liquidated Damages Provisions as penalties in two other places in this Second Analysis.  Ex. 8 at LPR 337.

7

**Loop Paper Claims $3,262,500 in Liquidated Damages.**

40.    At his damages deposition, Godfrey produced a third damages analysis and a final damages analysis.  Ex.9; Ex.10.

41.    Godfrey concludes that under the Liquidated Damages Provisions in Paragraphs 13, Loop Paper is entitled to $3,262,500 in liquidated damages, with some minor adjustments. Ex. 10; *see* Godfrey Damages Dep. at 51:10-23, 58:5-13.  He uses 4,500 tons (500 tons for the Newspaper Agreement and 4,000 tons for the Mixed Paper Agreement), 29 months, and $25.00 as his inputs for the liquidated damages formulas, and multiples those three numbers together to get $3,262,500.  Ex. 10.  He then modifies this number by adding $515,956.22 in alleged additional damages, and deducting a "credit" of $550,000, which Loop Paper has already collected from JC Horizon by drawing down on the letter of credit.  *Id.*  As a result, Loop Paper's final *ad damnum* is $3,228,456.22, or (($3,262,500 + $515,956.22) - $550,000).  Ex. 10; *see* Godfrey Damages Dep. at 89:11-90:7.

42.    In his final analysis, Godfrey used the same "Penalty Calculation" as he did in the Second Analysis to arrive at the $3,262,500 Loop Paper now claims as its "Total Damages Claim for December 2008 through April 2011."  Ex. 10; Godfrey Damages Dep. at 54:17-56:5.

43.    Loop Paper's claimed liquidated damages went down from $3,375,000 in the Second Analysis to $3,262,500 in the Final Analysis because Godfrey based his final calculation on a 29-month time-frame instead of a 30-month time-frame.  Ex.8; Ex.10; Godfrey Damages Dep. at 54:17-56:5.

44.    $362,500 of Loop Paper's claimed liquidated damages is based on the Newspaper Agreement.  Godfrey calculates this sum by multiplying 500 by 29 by 25.  *See* Ex. 10 ("Total

8

Damages Claim for December 2008 through April 2011"); *see also* Ex. 8 at LPR 337 ("Penalty Calculation Per Contract"); Ex. 9 ("Damage Calculation Per Contract-Using Minimum tons"). Specifically, Godfrey assumes that the Newspaper Agreement calls for the purchase of "average monthly minimum tons" of 500, multiplied by the 29 months Loop Paper believes remained on the Agreements when Loop Paper defaulted, multiplied by the Newspaper Agreement's $25 "Penalty per ton" for a "Total Penalty" amount. *See* Ex. 8 at LPR 337; Ex. 9; Ex. 10.

45.     The remaining $2,900,000 of Loop Paper's claimed liquidated damages is based on the Mixed Paper Agreement. Godfrey calculates this sum by multiplying 4,000 by 29 by 25. *See* Ex. 10. *See also* Ex. 8 at LPR 337; Ex. 9. Specifically, Godfrey assumes that the Mixed Paper Agreement calls for "an average monthly minimum tons" of 4,000 tons, multiplied by the 29 months Loop Paper believes remained on the Agreements when Loop Paper defaulted, multiplied by the Mixed Paper Agreement's $25 "Penalty per ton" for a "Total Penalty" amount. *See* Ex. 8 at LPR 337; Ex. 9; Ex. 10.

46.     Loop Paper seeks damages under the Liquidated Damages Provisions "solely and exclusively." Godfrey Damages Dep. at 58:5-12, 72:15-18.

**Godfrey Performed Additional Simple Calculations Supposedly Showing Loop Paper's Mitigation of Damages.**

47.     In addition to its liquidated damages calculation, Loop Paper also disclosed to JC Horizon a calculation referred to by Godfrey as a mitigation analysis in which he calculates Loop Paper's alleged "[n]et due for lost revenue." Ex. 9; Godfrey Damages Dep. at 71:18-72:18. He puts this amount at $1,563,553.41. Ex. 9.

48.     The "[n]et due for lost revenue" represents the difference between 31 months of

9

sales at the contract prices in the Agreements and the same sales made at allegedly lower prices at which Loop Paper was forced to sell after it terminated the Agreements. *See* Ex. 7 at LPR 2-4; Ex. 8; Ex. 9.

49. Godfrey states he undertook this analysis to show that Loop Paper mitigated its damages, and has asserted that Loop Paper is seeking "solely and exclusively" liquidated damages and not the "net due for lost revenue" amount that is part of his mitigation analysis. Godfrey Damages Dep. at 58:5-12, 71:18-73:9. Loop Paper's mitigation analysis was "preliminary." Godfrey Damages Dep. at 72:1-73:9.

50. This mitigation calculation is based on the same data inputs as the first and second damages analyses. *See* Ex. 7 at LPR 2-4; Ex. 8 at LPR 337; Ex. 9.

51. Those calculations were based on "simple arithmetic calculations" that were performed automatically within a Microsoft Excel spreadsheet. Godfrey Dep. at 120:23-124:9.

52. Godfrey testified that his calculations are based on quantitative reports that Loop Paper prepares in its ordinary course of business, fixed numbers from the Agreements, and "simple arithmetic." Godfrey Dep. at 123:22-124:9.

53. Loop Paper keeps records of its costs to acquire goods and the sales price of those goods. Godfrey Dep. at 75:10-76:14, 115:5-20. As a consequence, profit margin is "very easily calculated." *Id.* at 72:22-73:1.

54. Loop Paper's mitigation analysis took Godfrey a "couple hours" to prepare. Godfrey Dep. at 123:15-21.

Respectfully submitted,

**JC HORIZON LTD., d/b/a JC
HORIZON LTD.**

Dated: April 25, 2011

_/s/ Adam N. Hirsch_____
One of Its Attorneys

Alan R. Dolinko
Adam N. Hirsch
Ann Megan O'Malley Chessare
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100 – Telephone
(312) 663-0303 – Facsimile
adolinko@robinsoncurley.com
ahirsch@robinsoncurley.com
mchessare@robinsoncurley.com

## <u>CERTIFICATE OF SERVICE</u>

      Adam N. Hirsch, an attorney, certifies that he shall cause to be electronically filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, **DEFENDANT JC HORIZON LTD.'S LOCAL RULE 56.1(a)(1)(3) STATEMENT OF FACTS**, using the ECF/CME system, which shall send notice of such filing to all counsel of record.

                                         /s/   Adam N. Hirsch