UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LOOP PAPER RECYCLING, INC.,      )
                                 )
        Plaintiff/Counter-Defendant,  )
                                 )
    v.                           )
                                 )     Case No. 08 C 7364
JC HORIZON LTD.,                 )
                                 )     Judge John W. Darrah
        Defendant/Counter-Plaintiff.  )
                                 )
                                 )
                                 )
                                 )
                                 )
                                 )

## MEMORANDUM OPINION AND ORDER

Plaintiff Loop Paper Recycling, Inc. ("Loop Paper") filed a Complaint against

Defendant JC Horizon Ltd. ("JC Horizon") on December 14, 2008, which has since been

amended. Loop Paper claims that JC Horizon breached two contracts relating to the

supply of paper products by Loop Paper to JC Horizon. JC Horizon has filed affirmative

defenses and counterclaims, alleging breaches of the same two contracts at issue in

Loop Paper's Amended Complaint. (Dkt. Nos. 64, 114.) Before the Court are

JC Horizon's Motion for Summary Judgment and Loop Paper's Motion for Summary

Judgment.

## BACKGROUND

The following facts are taken from the Parties' statements of undisputed material facts submitted in accordance with Local Rule 56.1.[1]

Loop Paper is a paper recycling and distribution company. (JC Horizon's 56.1(a)(3) ¶ 3.) George Ward ("Ward") is Loop Paper's president. Jeffrey Godfrey ("Godfrey") is the CFO of Draw Enterprises III, which is Loop Paper's management company. (*Id.* ¶ 4.) Steve Sulli ("Sulli") was, at all relevant times, Loop Paper's general operations manager. (*Id.*) JC Horizon is an exporter of recycled paper, metal, and plastic products. (*Id.* ¶ 1.) JC Horizon's president is Judy Lee ("Lee"). (*Id.* ¶ 2.)

On April 19, 2008, JC Horizon and Loop Paper entered into two agreements for the sale and purchase of various paper products (the "Agreements"). (*Id.* ¶ 7.) The Agreements were to be effective from May 1, 2008 to April 30, 2011. (Loop Paper's 56.1(b)(3)(c) ¶ 13.) The Agreements were signed by Lee and Ward. (*Id.* ¶ 6.)

The first agreement was for the purchase and sale of paper products called "News # 8" and "News # 9" (the "Newspaper Agreement"). (JC Horizon's 56.1(a)(3) ¶ 8.) The numbers "8" and "9" refer to different qualities of newspaper as described in the

---

[1] Local Rule 56.1(a)(3) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). A litigant's failure to dispute the facts set forth in its opponent's statement in the manner required by Local Rule 56.1 results in those facts' being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

Paper Stock Institute of America, Standards and Practices Circular (the "Circular"), which is incorporated by reference into the Agreements. (*Id.*) The parties dispute what quantities of News # 8 and News # 9 JC Horizon agreed to buy and Loop Paper agreed to sell per month. Loop Paper agreed to sell and JC Horizon agreed to buy News #9 at the Chicago official board market price, plus fifty-five (55) dollars, per ton and News #8 at the Chicago official board market price, plus fifty dollars (50), per ton. (Loop Paper's 56.1(b)(3)(c) ¶ 17.)

The second agreement was for the purchase and sale of old corrugated cardboard ("OCC") and mixed paper ("MXP"), called "OCC 11" and "MXP 1" ("OCC/MXP Agreement"). (JC Horizon's 56.1(a)(3) ¶ 9.) The numbers "11" and "1" are taken from the Circular. (*Id.*) The OCC/MXP Agreement calls for JC Horizon to purchase a minimum of 3,000 tons of OCC and 1,000 tons of Mixed Paper each month. (*Id.* ¶ 10.) Loop Paper agreed to sell and JC Horizon agreed to buy OCC and MXP at the Chicago official board market ("OBM") price, plus forty-five (45) dollars, per ton. (Loop Paper's 56.1(b)(3)(c) ¶ 18.)

The Agreements contain an identical provision, stating that "[t]he Buyer agrees to purchase and Seller agrees to sell quantities within the minimum and estimated maximum range each month." (JC Horizon's 56.1(a)(3) ¶ 11.) The Agreements also contain an identical paragraph captioned "Default/Termination":

> Only upon material breach or default of the terms of this agreement by either party and after such breach or default remains in effect for a period of thirty (30) days from the date of receipt of a written notice from the other party, the other party shall be entitled to (i) termination of this agreement and a claim for damages or (ii) abide by the terms and conditions of this agreement and claim specific performance with or without the option of damages. In the event Buyer defaults and remains in

default beyond the cure period, it is agreed and understood that Buyer shall then pay to Seller damages calculated under the following formula: The average monthly minimum tons multiplied by $25.00 multiplied by the number of months remaining in the agreement.

("Liquidated Damages Provisions") (*Id.* ¶ 13.) The Agreements contains a choice-of-law provision: "This Agreement shall be governed by and construed in accordance with the laws of the United States and the State of Illinois." (*Id.* ¶ 14.) The Agreements also contain a forum-selection clause, naming "courts having situs within the City of Chicago, State of Illinois." The terms of the Agreements were negotiated by the presidents of both companies, Ward and Lee, and by Sulli, the general manager of Loop Paper. (Loop Paper's 56.1(b)(3)(c) ¶ 9.) Godfrey of Loop Paper also participated in negotiating and drafting the Agreements. (JC Horizon's 56.1(a)(3) ¶ 15.) The Agreements were drafted by Loop Paper's lawyer, Matthew Carmody. (*Id.* ¶ 16.)

JC Horizon submitted purchase orders on a month-to-month basis, pursuant to the Agreements, to Loop Paper for certain amounts of each type of paper; and Loop Paper would attempt to fill those purchase orders. (*Id.* ¶ 17.) The Agreements further provided that JC Horizon would establish an irrevocable standby letter of credit for $550,000 with United Commercial Bank. (Loop Paper's 56.1(b)(3)(c) ¶ 22.)

The parties dispute facts as to whether each party complied with the Agreements before October 2008.[2] JC Horizon alleges that Loop Paper failed to ship the minimum quantities specified within the Agreements to JC Horizon. Loop Paper alleges that it was

---

[2] In its Rule 56.1(a)(3) statement, Loop Paper sets forth statements, alleging that JC Horizon breached the Agreements before October 2008, which are based on inadmissible hearsay. (Loop Paper's 56.1(a)(3) ¶¶ 23-39.) Specifically, Paragraph 23 relies on inadmissible hearsay. JC Horizon's request to strike this paragraph is granted. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

unable to ship the full amount that JC Horizon ordered because JC Horizon failed to provide the shipping containers. Between May 2008 and October 2008, JC Horizon purchased News 8 and OCC from other suppliers in Illinois and Michigan. (JC Horizon Resp. to Loop Paper's 56.1(b)(3)(c) ¶ 30.)

By October 15, 2008, JC Horizon had not submitted any purchase orders for the minimum amounts JC Horizon was required to purchase for October 2008. (JC Horizon's 56.1(a)(3) ¶ 18.) On that date, Sulli of Loop Paper e-mailed Lee of JC Horizon, asking whether JC Horizon was going to order paper to satisfy its obligations for that month. (*Id.* ¶ 19.) Sulli wrote, "I need to hear from you today in writing or I will pass this to our legal department for further action." (*Id.*) Lee replied to Sulli's email and stated, "[I]t is [not][3] our fault that can not exercise the contract." She further explained: "[T]he whole economy in the USA and China is up side down . . . due to mill shut down, due to short of money [sic], due to no more import licenses." (Loop Paper's 56.1(b)(3)(c) ¶ 31.)

JC Horizon ordered some paper from Loop Paper in October, but Loop Paper found those orders to be insufficient to meet JC Horizon's obligations for that month. (JC Horizon's 56.1(a)(3) ¶ 21.) JC Horizon has not issued any purchase orders for paper from Loop Paper since mid-October 2008. (*Id.* ¶ 22.) By October 28, 2008, Loop Paper believed JC Horizon was in default under the Agreements. (*Id.* ¶ 23.) Loop Paper claims it gave written notice of default to JC Horizon on or about that date. (*Id.* ¶ 24.)

---

[3] Lee inadvertently omitted the word "not" before "fault." That Lee's email contains a typographical error is supported by her deposition testimony. (JC Horizon Resp. to Loop Paper's 56.1(b)(3)(c) ¶ 31.)

5

Pursuant to the provisions in the Agreements referred to above, JC Horizon had posted the $550,000 standby letter of credit for the benefit of Loop Paper. (*Id.* ¶ 26.) This standby letter of credit was a "guaranty of the payment terms or the payment of damages as set forth in [Paragraph] 13 herein." (*Id.* ¶ 27.) From November 7, 2008 to December 17, 2008, Loop Paper proceeded to draw down the $550,000 of JC Horizon's letter of credit. (*Id.* ¶ 29.) Loop Paper now claims that this money is compensation for its damages. (*Id.*)

Under the Liquidated Damages Provisions, Loop Paper could either terminate the Agreements and sue for damages or it could seek specific performance. (*Id.* ¶ 30.) Loop Paper elected to terminate the Agreements and sue for money damages only. (*Id.* ¶ 31.) On December 24, 2008, Loop Paper filed the instant Complaint. (*Id.*) Loop Paper has not requested specific performance of the Agreements, nor does it seek actual damages. (*Id.*) In its Complaint, Loop Paper requests actual damages but specifically quotes and relies on the liquidated damages provision to calculate damages. (Am. Compl. ¶¶ 31, 26, 41, 46.) Specifically, in paragraph 32 of its Complaint, Loop Paper specifically seeks damages pursuant to the liquidated damages provisions, stating: "[I]f JC Horizon defaults and remains in default beyond the cure period of 30 days, JC Horizon shall pay Loop Paper damages in the amount of the average monthly minimum tons multiplied by $25.00 multiplied by the number of months remaining in the agreement." Loop Paper also alleges that "JC Horizon has breached [the Agreements] with Loop Paper by failing to purchase the minimum monthly tonnages, or by paying

damages in accordance with the formula set forth in Paragraph 13 of the [Agreements] because it has been in default for more than 30 days."[4]  (*Id.* ¶ 33.)

In its Answer, JC Horizon asserts seven affirmative defenses as follows:  the Agreements are unenforceable because they do not contain adequate quantity terms (First Affirmative Defense); the Agreements are unenforceable because they are not requirement contracts (Second Affirmative Defense); Loop Paper's breaches of the Agreements relieved JC Horizon of its obligations to perform (Third Affirmative Defense); if the Agreements are valid, Loop Paper failed to perform by failing to deliver to JC Horizon the amounts of paper requested by JC Horizon (Fourth Affirmative Defense); if the Agreements are valid, Loop Paper failed to mitigate its damages (Fifth Affirmative Defense); if the Agreements are valid, Loop Paper did not suffer damages because it was able to sell goods it had promised to JC Horizon to other buyers (Sixth Affirmative Defense); and Loop Paper cannot recover damages because liquidated damages provisions are unenforceable penalties (Seventh Affirmative Defense). JC Horizon asserts two counterclaims, alleging that Loop Paper failed to satisfactorily and accurately fill JC Horizon's purchase orders during the first several months after the contract was executed; provided JC Horizon with containers of paper products that weighed less than Loop Paper represented; and Loop Paper's actions damaged JC Horizon's reputation and goodwill.

---

[4] Loop Paper does not dispute this fact.  Moreover, as it concedes in its Rule 56.1(b)(3) response and its briefs, Loop Paper only requests damages pursuant to the liquidated damages provision and does not seek actual damages.

Godfrey, the CFO of Draw Enterprises III, Loop Paper's management company, is Loop Paper's designated damages witness. (JC Horizon's 56.1(a)(3) ¶ 36.) Godfrey has prepared four written damages analyses on behalf of Loop Paper for this case. (*Id.*) In Loop Paper's First Analysis, Godfrey included a caption titled "penalty" in the liquidated damages calculation. (*Id.* ¶ 37.) Godfrey also testified in a Rule 30(b)(6) deposition that the rationale of the Liquidated Damages Provisions was to make sure that JC Horizon purchased the paper that it was required to purchase under the contracts. (*Id.* ¶ 38.)

On April 6, 2011, Godfrey updated his damages analysis. (*Id.* ¶ 39.) In this second analysis, Godfrey created a table captioned "Penalty Calculation Per Contract," which contains his calculation of the Liquidated Damages, the sum of which he calls the "Total Penalty." (*Id.*) Godfrey refers to the Liquidated Damages Provisions as penalties in two other places in this Second Analysis. (*Id.*)

At his damages deposition, Godfrey produced a third damages analysis and a final damages analysis. (*Id.* ¶ 40.) Godfrey concludes that under the Liquidated Damages Provisions, Loop Paper is entitled to $3,262,500 in liquidated damages, with some minor adjustments. (*Id.* ¶ 41.) This calculation is based on 4,500 tons of paper products (500 tons for the Newspaper Agreement and 4,000 tons for the Mixed Paper Agreement), a 29-month time-frame, and a cost of $25.00 per ton pursuant to the liquidated damages formulas, and then multiplying these three numbers to arrive at total damages of

$3,262,500 for both the Newspaper and Mixed Paper Agreements.[5] (*Id.*) Godfrey then modifies $3,262,500 by adding $515,956.22 in claimed additional damages and deducting a "credit" of $550,000, which Loop Paper has collected from JC Horizon by drawing down on the letter of credit. (*Id.*) As a result, Loop Paper's final total is $3,228,456.22, or (($3,262,500 + $515,956.22) - $550,000).[6] (*Id.*)

As discussed above, Loop Paper seeks damages under the Liquidated Damages Provisions "solely and exclusively." (*Id.* ¶ 46.)

In addition to its liquidated damages calculation, Loop Paper also disclosed to JC Horizon a calculation referred to by Godfrey as a mitigation analysis, in which he calculates Loop Paper's "[n]et due for lost revenue." (*Id.* ¶ 47.) Godfrey calculates the net due from lost revenue at $1,563,553.41 (*Id.*) This amount represents the difference between 31 months of sales at the contract prices in the Agreements and the same sales made at allegedly lower prices at which Loop Paper was forced to sell after it terminated the Agreements. (*Id.* ¶ 48.) This mitigation calculation is based on the same data inputs as the first and second damages analyses. (*Id.* ¶ 50.) Godfrey stated that these calculations were based on "simple arithmetic calculations" that were performed automatically within a Microsoft Excel spreadsheet. (*Id.* ¶ 51.) Godfrey testified that his calculations are based on quantitative reports that Loop Paper prepares in its ordinary

---

[5] The Newspaper Agreement damages amount of $362,500 was calculated by multiplying 500 x 29 x 25. The Mixed Paper Agreement damages amount of $2,900,000 was calculated by multiplying 4,000 x 29 x 25.

[6] Loop Paper's claimed liquidated damages was reduced from $3,375,000 in the second analysis to $3,262,500 in the final analysis because Godfrey based his final calculation on a 29-month time-frame instead of a 30-month time-frame used in the second analysis. (*Id.* ¶ 43.)

course of business, fixed numbers from the Agreements, and "simple arithmetic." (*Id.* ¶ 52.) Loop Paper keeps records of its costs to acquire goods and the sales price of those goods. (*Id.* ¶ 53.) Godfrey testified that, as a consequence, profit margin is "very easily calculated" and that the mitigation analysis took Godfrey a "couple hours" to prepare. (*Id.*)

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment, nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (internal citation omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*)).

## ANALYSIS

Both parties have moved for summary judgment.[7] JC Horizon[8] moves for summary judgment on its Seventh Affirmative Defense, arguing that the Liquidated Damages Provision at issue in this case is an unenforceable penalty clause. Therefore, Loop Paper's breach-of-contract claims fail because it cannot prove the damages elements of its claims. On the other hand, Loop Paper argues that its damages are properly calculated pursuant to the Liquidated Damages Provisions. Loop Paper further argues that it is entitled to summary judgment on each of JC Horizon's seven Affirmative Defenses and its Counterclaims. The enforceability of the Liquidated Damages Provisions is addressed first.

Whether the liquidated damages clause is valid or an unenforceable penalty clause is a question of state law. *See Checkers Eight LP v. Hawkins*, 241 F.3d 558, 562 (7th Cir. 2001) (*Checkers*). Here, Illinois law applies because the Agreements contain an Illinois choice-of-law provision. "In Illinois, liquidated damages provisions will be found valid and enforceable when: (1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was

---

[7] The parties' briefing is largely redundant. JC Horizon and Loop Paper raise the same issue, which is whether Loop Paper may recover damages under the Liquidated Damages Provisions.

[8] JC Horizon's memoranda do not cite to specific paragraphs of the statement of facts. Instead, JC Horizon improperly cites directly to evidentiary exhibits. "Citing directly to the record in the memorandum . . . rather than citing to its 56.1(a)(3) statement, negates the purpose of the summary judgment exercise . . . The court should be spared from engaging in this type of guesswork. The aim of a 56.1(a)(3) statement is to organize the arguments, give the [nonmovant] an opportunity to respond, and economize court resources by lessening the need to 'scour the record.'" *Daoust v. Abbott Labs.*, No. 05 C 6018, 2006 WL 2711844, at *2 (N.D. Ill. Sept. 19, 2006).

reasonable at the time of contracting, bearing some relation to the damages which might be sustained; and (3) actual damages would be uncertain in amount and difficult to prove." *Grossinger Motorcorp Inc. v. Am. Nat'l Bank and Trust Co.*, 240 Ill. App. 3d 737, 749 (1st Dist. 1992) (*Grossinger*). In addition, when the sole purpose of the clause is to secure performance of the contract, the provision is an unenforceable penalty. *Checkers*, 241 F.3d at 562 (citing *Am. Nat'l Bank & Trust of Chicago v. Regional Transp. Auth.*, 125 F.3d 420, 440 (7th Cir. 1997)). However, it does not follow that a liquidated damages provision's sole purpose must be to secure performance in order for it to be an unenforceable penalty. *See MED+PLUS Neck & Back Pain Ctr., S.C. v. Noffsinger*, 311 Ill. App. 3d 853, 861 (2nd Dist. 2000) (*MED+PLUS Neck & Back Pain Ctr.*)

"Although this test is instructive, [a court should be] mindful that there is no fixed rule applicable to all liquidated damages provisions, as each must be evaluated on its own facts and circumstances." *Energy Plus Consulting, LLC v. Illinois Fuel Co., LLC*, 371 F.3d 907, 909 (7th Cir. 2004) (*Energy Plus*). While "[t]he distinction between a penalty and liquidated damages is not an easy one to draw," close cases will be resolved in favor of finding the disputed clause a penalty. *Lake River Corp. v. Carborundum*, 769 F.2d 1284, 1290 (7th Cir. 1985) (*Lake River*). The burden of proving that a clause imposes a penalty rests with the party resisting its enforcement. *XCO Intern. Inc. v. Pacific Scientific Co.*, 369 F.3d 998, 1003 (7th Cir. 2004).

With respect to the first factor articulated in *Grossinger*, neither party disputes that the parties did not intend to agree in advance to the settlement of damages that might arise from the breach. Regarding the reasonableness of the liquidated damages provision, the inquiry is "not whether the actual damages ultimately caused by the breach are

12

exactly the same as the amount specified in a liquidated damages provision, but rather whether the liquidated damages amount is a reasonable forecast of and bears some relation to the loss, as forecast at the time of contracting." *Dallas v. Chicago Teachers Union*, 945 N.E.2d 1201, 1205 (1st Dist. 2011).

JC Horizon first asserts that Loop Paper admits that the Liquidated Damages Provisions are penalties that were designed to secure JC Horizon's performance. (Dkt. No. 97 at 9.) JC Horizon specifically argues that Godfrey admitted that the Liquidated Damages Provisions were "penalties" at his deposition. A reading of these cited excerpts in context, however, demonstrates that JC Horizon mischaracterizes Godfrey's testimony. It was JC Horizon's counsel who used the term "penalty clause" in his direct examination. Thus, it is not conclusive the deposition excerpts cited by JC Horizon constitute admissions by Godfrey that the damages provisions are penalties. JC Horizon further argues that Godfrey used the label "penalty" in his Excel spreadsheets, in which he calculates Loop Paper's damages. But Godfrey is an accountant who was testifying as to Loop Paper's damages. It is axiomatic that "whether a contractual provision for damages is a valid liquidated-damages provision or a penalty clause is a question of law." *Penske Truck Leasing Co., L.P. v. Chemetco, Inc.*, 311 Ill. App. 3d 447, 454 (5th Dist. 2000). Even if Godfrey had offered an opinion as to whether the Liquidated Damages Provisions are penalties, "lay testimony offering a legal conclusion is inadmissible because it is not helpful to the jury as required by [Federal] Rule [of Evidence] 701(b)." *United States v. Noel*, 581 F.3d 490, 496 (7th Cir. 2009).

However, Godfrey did make the following deposition statement:

Q. And did you understand that the purpose for including this $25 penalty

clause was to make sure that JC Horizon purchased the paper that it was required to purchase under these contracts?

A. Yes.

(Loop Paper's 56.1(a)(3), Ex. 7 at 133.) Godfrey is CFO of Loop Paper's management company and participated in the negotiation and drafting of the agreements. This admission is competent and probative evidence that the damages clause was designed to secure performance of the contract and hence an unenforceable penalty. *See MED+PLUS Neck & Back Pain Ctr.*, 311 Ill. App. 3d at 861 (holding that a liquidated damages provision to be an unenforceable penalty because it was "a mechanism designed to secure defendant's performance of the contract.").

JC Horizon next argues that the Liquidated Damages Provisions are not a reasonable forecast of damages because it is "invariant to the gravity" of Loop Paper's breach. For example, Loop Paper would be entitled to the average minimum monthly tons multiplied by $25 per ton for the remaining months of the contract regardless of whether JC Horizon fully or partially breaches the contract. On the other hand, Loop Paper argues that the Liquidated Damages Provisions are reasonable given the market prices of Newspaper, MXP, and OCC at the time the contract was executed. The Agreements specifies prices that are calculated by using the OBM price and adding a certain monetary amount per ton for each product. Loop Paper contends that the price of the products varied between $120 to $165 per ton at the outset of the contracts.[9] In light

---

[9] Loop Paper cites directly to the OBM Yellow Sheet, which contains the OBM prices for the various products at issue. (Dkt. No. 106, Ex. Q.) However, Loop Paper did not cite this exhibit anywhere in its statement of facts; and JC Horizon has not had an opportunity to respond to this proposed fact. Therefore, these numbers are used here only for hypothetical purposes.

of these market prices, Loop Paper argues that the $25 per ton calculation in the liquidated damages clause is reasonable.

But Loop Paper ignores the fact that the Liquidated Damages Provisions do not account for variances in breaches — they specify a one-size-fits-all approach for all breaches of the Agreements. Loop Paper argues that the "total damages under the clause are also flexible, the closer to the end of the [A]greement[s] that the parties were, the less the total amount of damages." (Dkt. No. 103 at 10.) However, if JC Horizon breaches towards the beginning of the Agreements, Loop Paper is entitled to damages that would be disproportionate to its actual damages. For example, if JC Horizon breached the agreement the day after the Agreements were executed, Loop Paper would be able to collect damages for three years without any performance under the Agreements.

*Lake River* is persuasive here. There, the Court of Appeals held that a liquidated damages clause was a penalty because it was designed to assure that the defendant would receive more than its actual damages. In *Lake River*, Carborundum manufactured an abrasive powder used in making steel and entered into a contract with Lake River, by which the latter agreed to provide distribution services of the abrasive powder to Carborundum's customers in Illinois. The liquidated damages clause provided that Carborundum would ship to Lake River a minimum of 22,500 tons of abrasive powder for packaging and distribution. Further, if at the end of the three-year term, Carborundum had not met the 22,500 minimum, Carborundum was to pay Lake River "the then prevailing rates for the difference between the quantity bagged and the minimum guaranteed." *Id.* at 1286. In holding that this was a penalty, the Court of Appeals noted:

When a contract specifies a single sum in damages for any and all breaches even though it is apparent that all are not of the same gravity, the specification is not a reasonable effort to estimate damages; and when in addition the fixed sum greatly exceeds the actual damages likely to be inflicted by a minor breach, its character as a penalty becomes unmistakable.

*Id.* at 1290.

The "minimum guarantee" damages clause in *Lake River* is conceptually similar to the clause at issue. Here, the parties contracted to buy and sell a minimum amount of tons of various paper products per month. If JC Horizon breached the Agreements, the damages clauses require JC Horizon to pay $25 per ton for the minimum monthly amounts until the end of the three-year contract. Like *Lake River*, the damages clauses in this case specify a single formula for damages for any and all breaches. This formula is not reasonable because it does not take into account circumstances under which JC Horizon partially breaches the contract. For example, JC Horizon could breach the contract by ordering only half the minimum monthly amount of Newspaper, Mixed Paper, or OCC; or, JC Horizon could choose not to place orders for two months but then resume placing orders thereafter. In both cases, JC Horizon would still be required to pay $25 per ton for the *entire* minimum monthly tonnage amounts under the Liquidated Damages Provisions for the remaining months of the three-year contract.

Therefore, here, as in *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 118 F.3d 1157 (7th Cir. 1997) (*Lawyers Title*), the Liquidated Damages Provisions are unreasonable because "the sanction seems . . . highly disproportionate to any reasonable estimate of the harm." *Id.* at 1160. *Lawyers Title* involved a liquidated damages provision under which for every check the defendant escrow agent wrote a mortgage

lender that bounced, the mortgage lender was entitled to a penalty equal to the face amount of the check. The Court of Appeals illustrated an example in which the amount of liquidated damages was not related to the actual damages: "If Dearborn bounced a check to United for $150,000 and one day later replaced it with a check that cleared, United would be entitled to claim 'damages' of $150,000. Yet its only loss would be one day's interest on $150,000, which at an interest rate of 10 percent a year would be less than $50." Along the same lines, here, if JC Horizon were to breach the contract the day after it was executed, Loop Paper would be entitled to a windfall recovery, which would far exceed its actual damages. Because "the amount of liquidated damages was [not] reasonable at the time of contracting and did not bear some relation to the damages which might be sustained," the Liquidated Damages Provisions are unenforceable. *Grossinger*, 240 Ill. App. 3d at 749.

Further evidence of the unreasonableness of the damages provisions can be found in review of Godfrey's damages analyses. Loop Paper contends that "liquidated damages clauses are valid even if parties did not estimate damages reasonably at the time they entered into contracts, if they prove to be a reasonable estimate at the time of the breach." (Dkt. No. 103 at 10.) *See Yockey v. Horn*, 880 F.2d 945, 951-54 (7th Cir. 1989) ("[T]he reasonableness of the amount set in a liquidated damages clause is to be looked at as of the time of contracting and at the time of actual breach. If at *either* time the estimate is reasonable, the clause will be enforced.") (emphasis in original). Loop Paper argues that absent the application of the Liquidated Damages Provisions, Loop Paper will be compensated in an amount that "is in all likelihood, less than its total actual damages." (Dkt. No. 103 at 10.)

17

But Loop Paper's argument is not supported by the undisputed facts. As set out above, under the Liquidated Damages Provisions formula, Loop Paper's damages would be $3,228,46.22. However, in his mitigation analysis, Godfrey calculates the "net due for lost revenue" as $1,563,553.41. This number represents the difference between Loop Paper's resale prices and JC Horizon's contract prices — or, in other words, Loop Paper's actual damages. Pursuant to the Uniform Commercial Code ("UCC"), which Loop Paper admits governs this dispute, the proper damages calculation that Loop Paper may recover is "the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this Article (Section 2-710), but less expenses saved in consequence of the buyer's breach." 810 ILCS 5/2-706(1). Thus, even when viewed *ex post*, the Liquidated Damages Provisions overstate damages by approximately $1.7 million. And this figure does not take into account the $550,000 that Loop Paper obtained when it drew down JC Horizon's line of credit. As discussed, because the Liquidated Damages Provisions are not reasonable, they are not valid and enforceable under Illinois law. *Grossinger*, 240 Ill. App. 3d at 749.

The Liquidated Damages Provisions are also unenforceable because actual damages are not difficult to assess in this case, as demonstrated by Godfrey's "mitigation analysis" set out above. Loop Paper's actual damages are calculated by taking the difference between Loop Paper's resale prices and JC Horizon's contract prices. This is a simple measure of actual damages that was readily apparent (or should have been) at the time Loop Paper and JC Horizon entered into the Agreements. *See Energy Plus*, 371 F.3d at 909 ("In Illinois, a liquidated damages clause is valid and enforceable when: "(1) the actual damages from a breach are difficult to measure at the time the contract was

made . . .").  Thus, the Liquidated Damages Provisions are unenforceable because, here, it is not difficult to measure actual damages.  *See Hickox v. Bell*, 195 Ill. App.3d 976, 987 (5th Dist. 1990) ("As a determination of actual damages in the event of breach of contract would not be difficult, we find as a matter of law that the liquidated damages clause is not enforceable.").

As Loop Paper concedes, it has made clear that it only sought to recover damages under the Liquidated Damages Provisions.  (Dkt. No. 103 at 13.)  As JC Horizon admits and as Loop Paper's mitigation analysis demonstrates, Loop Paper has suffered actual damages.  But Loop Paper made a choice to seek damages only under the Liquidated Damages Provisions rather than requesting its actual damages.  *Cf. Berggren v. Hill*, 401 Ill. App. 3d 475, 479 (1st Dist. 2010) ("The nondefaulting party may choose not to demand the amount or remedy set forth in the liquidated damages clause.").

Based on the foregoing, the Liquidated Damages Provisions in the Agreements are unenforceable.  Therefore, JC Horizon's Motion for Summary Judgment as to its Seventh Affirmative Defense is granted.  For the same reasons, Loop Paper's Motion for Summary Judgment is denied as to its claims for breach of contract (Counts I and II) and JC Horizon's Seventh Affirmative Defense.  Because Loop Paper cannot recover any damages under the Liquidated Damages Provisions — its only request for damages in this case — Loop Paper's breach-of-contract claims fail.  *See Kopley Group V., L.P. v. Sheridan Edgewater Properties, Ltd.*, 376 Ill. App. 3d 1006, 1014 (1st Dist. 2007) ("To succeed on a claim for breach of contract, a plaintiff must plead and prove . . . a breach by the defendant, and damages as a result of the breach.").

Loop Paper further requests summary judgment on JC Horizon's remaining affirmative defenses. JC Horizon's First, Second, Fifth, and Sixth Affirmative Defenses relate to the enforceability of the Agreements. In light of the ruling that Loop Paper's breach-of-contract claims are dismissed, these affirmative defenses are moot. For the same reason, Loop Paper's Motion as to JC Horizon's Third Affirmative Defense is moot because it involves JC Horizon's obligation to perform under the contract.

Loop Paper has also moved for summary judgment on JC Horizon's counterclaims. In its Counterclaims I and II, JC Horizon alleges that Loop Paper failed to satisfactorily and accurately fill JC Horizon's purchase orders during the first several months after the contract was executed; provided JC Horizon with containers of paper products that weighed less than Loop Paper represented; and Loop Paper's actions damaged JC Horizon's reputation and goodwill. Along the same lines, in its Fourth Affirmative Defense, JC Horizon alleges that Loop Paper failed to perform under the Agreements by failing to deliver the amounts of paper requested by JC Horizon.

In order to prove breach of contract, JC Horizon must demonstrate: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger Development, LLC v. National City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 759 (1st Dist. 2004)). Loop Paper argues that JC Horizon has provided no evidence of its damages. JC Horizon argues that it seeks damages of at least the $550,000 that Loop Paper obtained by drawing down JC Horizon's letter of credit. Loop Paper itself claims that the $550,000 that Loop Paper obtained by drawing down JC Horizon's letter of credit is compensation for its damages.

20

(*Id.* ¶ 29.) Thus, at the summary judgment stage, JC Horizon has pointed to sufficient evidence "that a reasonable jury could return a verdict for" JC Horizon as to its breach-of-contract counterclaims. *Anderson*, 477 U.S. at 248.

## CONCLUSION

For the reasons set forth above, JC Horizon's Motion for Summary Judgment on its Seventh Affirmative Defense [96, 97] is granted. Loop Paper's Motion for Summary Judgment [99, 100] is denied as to Counts I and II, JC Horizon's Counterclaims I and II, and JC Horizon's Fourth and Seventh Affirmative Defense.

Date: 8-17-11

JOHN W. DARRAH
United States District Court Judge